## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| TINA HAWKINS, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:20-CV-523 SRW |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on review of an adverse ruling by the Social Security Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties have consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF No. 25. Defendant filed a Brief in Support of the Answer. ECF No. 32. The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence. Based on the following, the Court will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Kilolo Kijakazi for Andrew M. Saul in this matter.

I.      **Factual and Procedural Background**

On October 12, 2017,[2] Plaintiff Tina Hawkins protectively filed an application for

disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 401, *et seq*. Tr. 135-36.

Plaintiff's application was denied on initial consideration, and she requested a hearing before an

Administrative Law Judge ("ALJ"). Tr. 91-101, 104-12.

Plaintiff and counsel appeared for a hearing on March 26, 2019. Tr. 53-90. Plaintiff

testified concerning her disability, daily activities, functional limitations, and past work. *Id*. The

ALJ also received testimony from vocational expert ("VE") Kristine Skahan, M.S. *Id*. On June

13, 2019, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 35-52.

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. On February

15, 2020, the Appeals Council denied Plaintiff's request for review. Tr. 1-7. Accordingly, the

ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court

accepts the facts as presented in the parties' respective statements of facts and responses. The

Court will discuss specific facts relevant to the parties' arguments as needed in the discussion

below.

II.     **Legal Standard**

A disability is defined as the inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his

physical or mental impairment or impairments are of such severity that he is not only unable to

---

[2] The ALJ indicated Plaintiff filed her application on October 6, 2017; however, review of the record reflects the application for DIB was filed on October 12, 2017.

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether "the claimant has a severe impairment [that] significantly limits claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir.

2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to her RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id.* The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.   The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff has not engaged in substantial gainful activity since June 15, 2017, the alleged onset date. Tr. 40. Plaintiff has the severe impairments of "lupus, headaches, seizures, and hypertension." *Id*. Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 41. The ALJ found Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [t]he [Plaintiff] can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. The [Plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. She can have occasional exposure to extreme cold and she should avoid hazards such as unprotected heights and moving mechanical parts.

Tr. 41-45. The ALJ found that Plaintiff was unable to perform her past relevant work. Tr. 45.

The ALJ further found Plaintiff was born on September 16, 1972 and was 44 years old, which is

defined as a younger individual age 18-49, on the alleged disability onset date. *Id*. Plaintiff has at

least a high school education and is able to communicate in English. *Id*. The ALJ determined the

transferability of job skills was not material to the determination of disability because, using the

Medical-Vocational Rules as a framework, it supported a finding that the claimant was "not

disabled," whether or not the claimant had transferable job skills. *Id*. Relying on the testimony of

the VE and considering Plaintiff's age, education, work experience and RFC, the ALJ found

there were jobs existing in significant numbers in the national economy which the Plaintiff could

perform, including representative occupations such as Photo Copy Machine Operator

(*Dictionary of Occupational Titles* ("*DOT*") No. 207.685-014); Mail Clerk (*DOT* No. 209.687-

026); and Garment Sorter (*DOT* No. 222.687-014). Tr. 45-46. The ALJ concluded Plaintiff was

not under a disability from June 15, 2017, through the date of her decision on June 13, 2019. Tr.

46.

## IV.   **Discussion**

Plaintiff challenges the ALJ's decision on three grounds: (1) the ALJ failed to properly

consider the opinion evidence of Dr. Kimberly Carroll, Dr. Paul L'Ecuyer, and the non-

examining state agency medical consultant; (2) the RFC is not supported by substantial evidence;

and (3) the ALJ's credibility evaluation did not conform to the analysis required by *Polaski v.

Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

### A. Opinion Evidence

#### 1. Dr. Kimberly Carroll

Plaintiff argues the ALJ erred by failing to properly evaluate the opinion evidence of Dr. Carroll who treated Plaintiff's lupus diagnosis since September 25, 2017.

The record contains a one-paragraph letter, dated December 5, 2017, in which Dr. Carroll states that Plaintiff was diagnosed with lupus at fifteen years of age and "has been on multiple medications to treat her disease . . . which affect the immune system." Tr. 516. Dr. Carroll wrote: "[the Plaintiff] noted to [her] during [a] clinic visit that she suffered from significant fatigue. This can be related to lupus itself and can also be a side effect of the medications she requires to treat her disease." *Id.* The letter concludes with following statement: "Though [Plaintiff] does not have significant, organ-threatening burden related to her lupus, she still deals with severe, chronic fatigue which makes her full time work and activities of daily living more difficult." *Id.*

On March 4, 2019, Dr. Carroll completed a "Lupus (SLE) Residual Functional Capacity Questionnaire." Tr. 557-63. Dr. Carroll checked the boxes that Plaintiff suffers from non-erosive arthritis and central nervous system involvement shown by seizures. Tr. 557-58. Dr. Carroll indicated Plaintiff would be incapable of performing even low stress jobs due to the following limitations: extreme fatigue; inability to walk more than one city block without rest; inability to sit for more than fifteen minutes at one time; inability to stand for more than fifteen minutes at one time; and inability to sit, stand, or walk for more than two hours in an eight-hour workday. Tr. 559-60. Dr. Carroll also opined that Plaintiff would sometimes need to take unscheduled breaks every 30-60 minutes in an eight-hour workday and would likely be absent more than four days per month. Tr. 560-62.

The ALJ found Dr. Carroll's opinions in the letter and the Questionnaire to be "unpersuasive." Tr. 45. In making this determination, the ALJ explained:

> Dr. Kimberly Jeanne Carroll, M.D. noted the [Plaintiff's] chronic fatigue, but also noted that she did not have significant organ effects of her lupus. Her general statement that her fatigue makes work and activities more difficult was not supported by the treatment records, while they document fatigue, do not document severe fatigue. Her lupus functional capacity questionnaire was inconsistent with the medical records, including pointing to seizures that were never confirmed nor any evidence of a seizure condition after terminating medical treatment. None of her treatment records support her restrictions regarding sitting, standing, or walking and there were no exam findings to support that she would miss days or need additional breaks.

*Id.*

For claims like Plaintiff's filed after March 27, 2017, an ALJ evaluates medical opinions pursuant to 20 C.F.R. § 404.1520c. These new rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, an ALJ is to evaluate the persuasiveness of any opinion or prior administrative medical finding by considering the: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the plaintiff, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 404.1520c(c). The rules make clear, however, that supportability and consistency are the "most important factors," and therefore, an ALJ must explain how he or she considered these factors in the decision. 20 C.F.R. § 404.1520c(b)(2). An ALJ may, but is not required to, explain how she considered the remaining factors. *Id. See Brian O v. Comm'r of Soc. Sec.*, No. 1:19-CV-983-ATB, 2020 WL 3077009, at

8

*4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'" (alterations omitted)).

In finding Dr. Carroll's opinion to be inconsistent and unsupported by the medical evidence, the ALJ cited to five of her treatment records. The first record documented Plaintiff's initial September 25, 2017 consultation. Tr. 409-17. Plaintiff reported "feeling slightly better" since she stopped "working as much," but complained of "a lot of ongoing fatigue." Tr. 42, 409. Upon examination, Dr. Carroll described Plaintiff's lupus as having "[n]o outward signs of active disease," noted Plaintiff had not experienced seizures for "several months," and was negative for weakness and headaches. Tr. 412, 414. Plaintiff was directed to continue her medication regimen as prescribed and did not note any physical limitations. Tr. 42, 414.

On December 29, 2017, Plaintiff appeared for a follow up appointment and reported "some joint pain in the hands" and fatigue. Tr. 673, 675. Plaintiff stated her medication "helped a bit" and denied weakness or headaches. Tr. 676. Her physical examination was mostly normal with some musculoskeletal tenderness but no active swelling. Tr. 43, 676. Dr. Carroll indicated she had "[n]o outward signs of increased [lupus] activity" and was given a trial of low dose prednisone for hand pain. Tr. 43, 677. Plaintiff did not see Dr. Carroll for a follow up appointment until April 4, 2018. Tr. 655. At that visit, Plaintiff reported "feeling a bit better since starting daily prednisone" and denied any fatigue, weakness, or headaches. Tr. 43, 655. A physical exam revealed no tenderness. Tr. 43, 653, 656. As to Plaintiff's lupus diagnosis, Dr.

Carroll wrote she has "some ongoing joint pain but no overt synovitis or outward signs of increased disease activity." Tr. 43, 657. Dr. Carroll did not mention any physical limitations.

On August 1, 2018, Plaintiff told Dr. Carroll she was "doing okay overall." Tr. 43, 634. Plaintiff stated she experienced some nausea, vomiting, and diarrhea, but thought they were side effects from her blood pressure medications. *Id.* Plaintiff also reported "a tingling sensation in both feet, more in the evenings." *Id.* Plaintiff again denied any fatigue, weakness, or headaches. Tr. 636. A physical exam did not reveal any tenderness. *Id.* Dr. Carroll wrote Plaintiff had "[n]o outward signs of increased disease activity." Tr. 43, 637. On November 19, 2018, Plaintiff discussed the possibility of irritable bowel syndrome symptoms with Dr. Carroll as well as "some chronic joint pains." Tr. 43, 610. Plaintiff reported her fatigue was "a little better" and denied weakness and headaches. Tr. 43, 610, 612. Dr. Carroll described Plaintiff as "stable." Tr. 613.

Plaintiff argues the medical record supports her fatigue as severe and, as a result, the ALJ erred by concluding that Dr. Carroll's letter and RFC Questionnaire were partially unpersuasive. Plaintiff cites to Dr. Carroll's September 25, 2017 treatment note which documented Plaintiff's report of "a lot of ongoing fatigue," Tr. 409, as well as five other instances in the record where Plaintiff reported fatigue to other treating physicians, Tr. 483, 526, 541, 675, 705. Plaintiff also takes issue with the ALJ's determination that Dr. Carroll's RFC Questionnaire was inconsistent with the record because Dr. Carroll considered Plaintiff's seizures, which the ALJ found to not be medically confirmed.

Although Plaintiff identifies specific records which support her self-reported symptoms of fatigue, "[i]f substantial evidence supports the [ALJ's] decision, then [the District Court] may not reverse, even if inconsistent conclusions may be drawn from the evidence and even if [the

District Court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). *See also Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) ("[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the District Court] must affirm the decision.").

Here, the ALJ did not err in finding Dr. Carroll's opinion to be unpersuasive. In the Court's careful review of the medical record, the Court found numerous instances between 2017 to 2019 in which Plaintiff *denied* symptoms of fatigue, thus, supporting the ALJ's determination that Dr. Carroll's description of Plaintiff's fatigue as "severe" was inconsistent with the record. *See* Tr. 438, 442, 447, 452, 457, 462, 471, 532, 581, 612, 636, 655, 696. Moreover, while there are two records which describe Plaintiff's fatigue as "extreme," such notes attribute her fatigue to "Benlysta infusions" which were subsequently discontinued because of her complaints of fatigue. Tr. 578, 583. Moreover, physical examinations performed by Dr. Carroll primarily described normal range of motion and reflexes with no acute distress. Tr. 425, 428, 526, 538, 541, 545, 697. It is the role of the ALJ to weigh and resolve conflicts in the medical evidence. *See Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. 2006). *See also KKC ex rel. Stoner*, 818 F.3d at 370 (ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." Here, the ALJ acknowledged Plaintiff's fatigue, considered the relevant medical records, and properly assessed Dr. Carroll's opinion in light of the medical records as a whole.

The Court further finds the ALJ appropriately considered that none of Dr. Carroll's treatment records indicated or discussed any restrictions to Plaintiff's physical activity, such as a limitation on sitting or standing as a result of her diagnosed medical conditions. In fact, none of

her treating physicians noted any restrictions on her ability to ambulate, stand, or sit. An ALJ may properly rely on the absence of medical restrictions in the evaluation of a plaintiff's limitations. *See Bryant v. Colvin*, 861 F.3d 779, 784 (8th Cir. 2017) ("[T]he ALJ rightfully noted the lack of any medical provider making allowances for any disability in [the plaintiff's] care").

The evidence of record also supports the ALJ's consideration of the fact that Plaintiff was not definitively diagnosed with seizures. Consequently, the ALJ did not err in finding Dr. Carroll's RFC Questionnaire partially unpersuasive due to her consideration of a clinical finding of "seizures and/or psychosis." For example, Plaintiff's treating neurologist, Dr. David Carpenter, wrote in a treatment note that "it was never clear that she had a seizure." Tr. 525.

Thus, the Court finds the ALJ's consideration of Dr. Carroll's opinion evidence to be consistent with and supported by the record as a whole.

### 2. Dr. Paul L'Ecuyer

Plaintiff argues the ALJ erred by failing to properly evaluate the opinion evidence of treating physician, Dr. L'Ecuyer.

On November 17, 2017, Dr. L'Ecuyer wrote a five-sentence letter to her employer recommending she not yet return to work as she was "still dealing with lupus which sometimes keeps [her] in bed all day" and "still recovering from her latest seizure and not able to drive yet." Tr. 514. On March 6, 2019, Dr. L'Ecuyer submitted a "Headaches Residual Functional Capacity Questionnaire." Tr. 553-55. Dr. L'Ecuyer described Plaintiff's headaches as "less severe due to recent increase of Amitriptyline but still not manageable." Tr. 553. He indicated her symptoms included nausea/vomiting, visual disturbances, and diarrhea. *Id.* He estimated Plaintiff suffers from headaches three to four times per month which last from two hours to all day, and are exacerbated by bright lights, moving around, and noise. Tr. 553-54. Dr. L'Ecuyer opined

Plaintiff would generally be precluded from performing basic work activities when she experiences a headache; would sometimes need to take unscheduled breaks during an 8-hour work day; and would be absent from work more than four times per month. Tr. 554-55. In the section of the form to indicate how much work stress Plaintiff could tolerate, it is unclear whether Dr. L'Ecuyer meant to place a checkmark in front of "incapable of 'low stress' jobs" or "capable of low stress jobs." Tr. 555.

The ALJ found the aforementioned opinion evidence of Dr. L'Ecuyer to be unpersuasive. Tr. 44. In making this determination, the ALJ wrote:

> His treatment notes do not indicate that the [Plaintiff] would need to spend all day in bed and the notes from Dr. Carpenter indicate that the [Plaintiff] was able to drive at the time Dr. L'Ecuyer provided his opinion. Dr. L'Ecuyer's headache questionnaire was unsupported by his treatment records, which did not document the frequency, severity, or precipitating influences he noted. He documents no photophobia and his treatment records indicated that the [Plaintiff's] headaches were better controlled with the increased Amitriptyline. It was unclear if he intended to mark that the [Plaintiff] was capable of low stress jobs or incapable of all jobs, which is a question reserved for the commissioner.

*Id*.

In finding Dr. L'Ecuyer's opinion to be inconsistent with the medical evidence and, therefore, unpersuasive, the ALJ cited to six of his treatment records. On October 6, 2017, Dr. L'Ecuyer described Plaintiff as "overall stable," and indicated she had good blood pressure control on current therapy with no side effects; was smoking less cigarettes, showed no seizure activity, and was prepared for her neurologist to clear her to resume driving in the fall. Tr. 42, 427. Her physical and mental exams were normal and no changes to her medications or treatment were made. Tr. 42, 427-28.

On May 10, 2018, Dr. L'Ecuyer saw Plaintiff for "preventative care" and indicated "she fe[lt] well overall." Tr. 43, 530. Although Dr. L'Ecuyer listed "migraine with aura and without

13

status migrainosus, not intractable" in his list of diagnoses for the visit, Plaintiff did not report

headaches or fatigue during Dr. L'Ecuyer's review of her systems. Tr. 43, 532. In fact, Dr.

L'Ecuyer described Plaintiff's migraines as a "resolved" problem. Tr. 569, 577. On September

12, 2018, Dr. L'Ecuyer once again described Plaintiff as "doing well overall." Tr. 43, 537. He

also indicated she was "seizure free, "driving without problems," and "blood pressure excellent

on therapy" with "no side effects." *Id.* Plaintiff denied any dizziness or headaches. Tr. 538.

Plaintiff had normal physical examination results and migraines were not listed in the diagnosis

list for the visit. Tr. 538-39.

On January 16, 2019, Dr. L'Ecuyer described Plaintiff as "feeling well" with improving

energy levels. Tr. 44, 541. Plaintiff reported "ongoing arthritis pain" and "recent migraine with []

GI issues," but her physical exam was normal. *Id.* Dr. L'Ecuyer increased the dosage of her

Amitriptyline prescription due to her complaints of recent migraines and directed her to keep a

headache log. Tr. 44, 542. On February 11, 2019, Plaintiff appeared for a follow up appointment

in which she reported that her migraines had "much improved on increased Amitriptyline" as

they were "less frequent" and "less severe." Tr. 44, 544. She again had a normal physical exam,

and no changes were made to her treatment. Tr. 44, 544-46.

After reviewing the above treatment notes, the ALJ determined Dr. L'Ecuyer's

November 15, 2017 letter to be unpersuasive. In the letter, Dr. L'Ecuyer opined Plaintiff could

not work because her lupus "sometimes ke[pt] [her] in bed all day" and she was "not able to

drive yet." Tr. 44, 514. The ALJ found these statements to be inconsistent with Dr. L'Ecuyer's

treatment notes. The Court agrees. Nowhere in the record does Dr. L'Ecuyer, or any other

treating physician, indicate that Plaintiff's lupus kept her in bed. To the contrary, one month

prior to writing the letter, Dr. L'Ecuyer recommended that Plaintiff "continue" daily aerobics

14

and twice-weekly resistance exercises. Tr. 428-29. Dr. L'Ecuyer did not indicate or suggest that her lupus diagnosis could prevent her from daily aerobics activities or that Plaintiff reported an inability to do so because of need to stay in bed all day. The ALJ also did not err by comparing Dr. L'Ecuyer's letter to Dr. Carpenter's notes, which indicated she was actually cleared to drive on October 24, 2017 despite Dr. L'Ecuyer's letter to her employer stating otherwise. Tr. 44, 484. *See* 20 C.F.R. § 404.1520c (supportability and consistency are mandatory factors for the ALJ to consider).

The ALJ also found Dr. L'Ecuyer's headache RFC Questionnaire to be unsupported by his treatment records "which did not document the frequency, severity, or precipitating influences." Tr. 44. The Court finds the ALJ did not err in making this determination. Although Dr. L'Ecuyer's Questionnaire indicates Plaintiff needs to lay in a dark cool room to alleviate her headaches and would need to take unscheduled breaks during an 8-hour workday, such recommendations were not included in any of his treatment notes. Tr. 554. To the contrary, his treatment notes indicated her headaches were better controlled with an increased dosage of Amitriptyline and none of his recommendations include her laying in a dark cool room at the onset of a headache. Other than prescribing medication, the only directive Dr. L'Ecuyer provided to Plaintiff was to maintain a headache log, which is not included in the record. Moreover, Plaintiff explicitly denied headaches on multiple occasions, which is inconsistent with Dr. L'Ecuyer's opinion that her headaches were disabling. Tr. 424, 427, 538, 696, 702.

Supportability and consistency are the two most important factors in evaluating the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2). By pointing out that Dr. L'Ecuyer's treatment records did not contain the same limitations and concerns he outlined in his letter and RFC Questionnaire, the Court finds the ALJ appropriately

based her analysis on the supportability and consistency factors. *See e.g., Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (finding that "ALJ had sufficient reason to discount" treating provider's opinion where he "included limitations in the MSS that are not reflected in any treatment notes or medical records") (quotation marks and citation omitted); *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement" that "include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [claimant's] medical records"); *Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (holding that "a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration" and that it is proper for ALJ to discount a provider statement that "contained limitations that 'stand alone,' did not exist in the physician's treating notes, and were not corroborated through objective medical testing").

Thus, the Court finds the ALJ's consideration of Dr. L'Ecuyer's opinion evidence to be consistent with and supported by the record as a whole.

### 3. Non-Examining State Agency Medical Consultant

Plaintiff argues the ALJ failed to discuss the opinion of the non-examining state agency medical consultant who did not have Plaintiff's most recent treatment notes. ECF No. 25 at 8. Plaintiff provides no additional argument, other than noting that the "ALJ's RFC is very similar to the state agency RFC." *Id.*

In response, the Commissioner acknowledges the ALJ did not evaluate the opinion of the state agency medical consultant, but argues the error was a harmless oversight as it had no impact on the outcome because the ALJ's RFC was more restrictive. *See* ECF No. 32 at 10-11.

The Commissioner does not cite to any case law to support the basis for his harmless error argument.

The Court assumes Plaintiff and the Commissioner are referring to Dr. Paul Spence's RFC Assessment, dated November 29, 2017. Tr. 95-101. Dr. Spence opined Plaintiff could perform light work with only occasional climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and no exposure to unprotected heights and moving mechanical parts. *Id.* The ALJ's RFC is identical to Dr. Spence's RFC, except the ALJ added the limitation that Plaintiff can only occasionally be exposed to extreme cold. *See* Tr. 41.

As Plaintiff argues, and the Commissioner does not dispute, the ALJ did not explicitly discuss Dr. Spence's RFC assessment. This assessment constitutes a "medical opinion" within the meaning of the Commissioner's regulations. 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the various demands of work.). When evaluating medical opinions and determining persuasiveness, the regulations require an ALJ to explain how he or she considered the factors of supportability and consistency in the decision. 20 C.F.R. § 404.1520c(b)(2).

Despite the Commissioner's assertion that the ALJ's oversight was harmless error, it appears from the ALJ's opinion and the hearing testimony that the ALJ relied heavily on the assessment of Dr. Spence by incorporating all of his limitations in the RFC determination, which significantly impacted the outcome of the disability determination. The ALJ only added one limitation, which reduced the amount of time Plaintiff could be exposed to extreme cold. Because the ALJ failed to explain how the opinion of a state agency consultant was more

17

persuasive than Plaintiff's own treating physicians and consistent with the medical record, as required by 20 C.F.R. § 404.1520c, the Court finds the ALJ committed reversible error when she failed to articulate the basis for her reliance on, or specifically mention, Dr. Spence's RFC opinion. *See* 20 C.F.R. §§ 404.1520c(a); 416.920c(c)(3).

After mostly discrediting the opinions of Plaintiff's treating physicians, the ALJ was then required to explain what other medical basis she relied upon in making Plaintiff's RFC determination. *See, e.g.*, *Myles v. Berryhill*, No. 17-C-4884, 2018 WL 3993731, at *3 (N.D. Ill. Aug. 21, 2018) (an ALJ must clearly articulate what medical evidence he relied on to support the limitations included in the RFC determination). Notably, the Court is only assuming the ALJ relied on Dr. Spence's opinion because it essentially mirrors Plaintiff's RFC. *See, e.g.*, *Phillips v. Saul*, No. 1:19-CV-34-BD, 2020 WL 3451519, at *3 (E.D. Ark. June 24, 2020) (remanding because "the ALJ did not articulate or explain the persuasiveness of the non-examining state agency medical consultants"). The Court, therefore, cannot discern whether the ALJ's assessment of Dr. Spence's medical opinion is supported by substantial evidence and, in turn, whether the RFC assessment is also supported by substantial evidence.

As Plaintiff points out, Dr. Spence provided his opinion in November 2017, more than one year prior to the hearing. Plaintiff argues Dr. Spence did not have the benefit of more recent treatment notes. *See e.g.*, *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *5 (E.D. Mo. Mar. 24, 2021) (remanding based on ALJ's reliance on an agency consultant's medical opinion without addressing the necessary 20 C.F.R. §§ 404.1520c factors and because the consultant did not have access to the plaintiff's most recent medical records when formulating his opinion).

The Court therefore finds it necessary to remand this case for further consideration of Dr. Spence's opinion to evaluate the persuasiveness of his RFC findings by considering the supportability of his RFC opinion with relevant objective medical evidence as well as its consistency with the evidence from other medical sources and nonmedical sources in the claim. If the ALJ did rely on Dr. Spence's RFC assessment, the ALJ should consider on remand whether Dr. Spence was provided with the necessary medical opinions to properly assess Plaintiff's physical condition and ability to work. *See e.g.*, *McDade v. Saul*, 2021 WL 1842024, at *3 (W.D. Ark. May 7, 2021) (remanding because the opinions of the non-examining state agency medical consultants were rendered before new evidence regarding the severity of plaintiff's condition became part of the record); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (remanding when a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment").

### B. RFC Analysis and Credibility Determination

Because remand is required for reevaluation of Dr. Spence's opinion, the Court need not reach the issue of whether the ALJ provided an insufficient discussion of how the evidence supported the RFC finding. Moreover, because the ALJ assessed Plaintiff's credibility in part based on her evaluation of the medical evidence, any reevaluation of the latter will necessarily require reassessment of Plaintiff's symptoms. *See e.g., Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [Plaintiff's] alternative ground for remand."); *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 n.34 (S.D.N.Y. 2015) (because the ALJ failed to develop the record, the Commissioner must "necessarily" reassess a claimant's RFC and credibility on remand). The Court notes that when the ALJ reevaluates the evidence on remand, she should ensure that her decision includes a

19

narrative discussion, consistent with Social Security Ruling 96-8p, of how she reached her RFC and credibility assessments.

Additionally, for consideration on remand, the Court acknowledges Plaintiff's argument that the ALJ did not address her 29-year work history in assessing her credibility. *See* ECF No. 25 at 14, Tr. 144. Notably, Plaintiff worked for the same company from 2004 to 2017. *See* Tr. 81-83, 139-41. "An ALJ is not statutorily required to consider a [plaintiff's] work history, but 'a [plaintiff] with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'" *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) (quoting *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)). On remand, the ALJ will have an opportunity to address Plaintiff's lengthy work history in assessing her credibility.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Kilolo Kijakazi for Andrew M. Saul in the court record of this case.

So Ordered this 17th day of August, 2021.

*/s/ Stephen R. Welby*
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE